# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2023-0356, <u>State of New Hampshire v. Christopher Viveney</u>, the court on June 13, 2025, issued the following order:**

The court has reviewed the written arguments and the record submitted on appeal, has considered the oral arguments of the parties, and has determined to resolve the case by way of this order.  <u>See</u> <u>Sup. Ct. R.</u> 20(3).  The defendant, Christopher Viveney, appeals his convictions on two alternative counts of aggravated felonious sexual assault (AFSA), <u>see</u> RSA 632-A:2, I(b), I(i) (Supp. 2024).  On appeal, the defendant argues that the Superior Court (<u>Delker</u>, J.) erred in barring the defense from introducing certain text messages between two witnesses who testified at trial and by sustaining a hearsay objection to certain testimony proffered by the defendant.  The defendant also posits that the trial court may have erred in not disclosing information contained in records the trial court reviewed <u>in</u> <u>camera</u>.  We need not decide whether either of the trial court's evidentiary rulings was erroneous, because we conclude that any purported error was harmless beyond a reasonable doubt.  In addition, our review of the records reviewed by the trial court <u>in camera</u> supports its decision not to disclose the records it withheld.  Accordingly, we affirm.

The jury could have found the following facts.  In March 2020, the defendant lived in Manchester where he had a girlfriend and a young son.  He was also a friend of Tyler Brooks, whom he had known since his childhood.  At that time, Brooks had been dating the victim, who had recently turned twenty-one, for approximately one month.

On the evening of March 14, 2020, Brooks and his roommate, Billy Preston, hosted a gathering at Brooks' residence to celebrate a birthday of a friend's brother.  The victim attended the gathering with a number of Brooks' friends whom she had not previously met.  After drinking at Brooks' residence for about an hour, the group of approximately ten people went to a Manchester bar where they had reserved private VIP tables.  The victim testified that she drank three cocktails at the bar, which was "crowded" and very busy.

Later that night, the defendant, who was not part of the group, appeared at the bar, where he ran into Brooks who introduced him to the victim.  At trial, witnesses' descriptions of the interaction between the defendant and the victim that night varied.  Brooks testified that after introducing the defendant to the victim, the victim walked away, and the defendant exclaimed, "dude,

she's so hot. Like, how did you score that one?" Brooks testified that the defendant also made a comment about having a threesome with the victim, but Brooks testified that he laughed the comment off and said something to the effect of "you wish." According to the defendant, he made the threesome comment in the victim's presence, and he testified that the victim giggled and appeared to be "intrigued" by his remark. In addition, the victim testified that someone unknown to her slapped her buttocks at the bar, whereas the defendant testified that Brooks grabbed his hand and "smacked her butt with it." According to the defendant, the victim responded by turning around and giving him "the kinky eyes." For his part, Brooks denied that he engaged in any such act or that the victim told him any such thing had happened. The defendant also testified that, within minutes of meeting him for the first time, the victim gave him a "lap dance" and showed him nude and semi-nude photographs of herself on a cell phone. At trial, the victim denied showing the defendant any pictures of herself.

After drinking for a couple of hours, Preston left the bar with his girlfriend and another friend who had been kicked out of the bar. They returned to Brooks' residence, and Preston and his girlfriend immediately went to bed in Preston's bedroom while their friend slept on a couch. At trial, Preston testified that he did not hear or see anyone else return to the residence that night. At some point after 11:00 p.m., Brooks and the victim left the bar and returned to the residence with another friend. Brooks estimated that they arrived at his residence "by midnight probably. He left the door to his residence unlocked in the event another member of the group who remained at the bar decided to spend the night there. When they arrived, the lights were off and everyone was sleeping. After she threw up in the kitchen sink, the victim and Brooks went to Brooks' bedroom, shut the door and went to bed. Brooks brought a bowl to the bedroom because the victim told him she might throw up again. Brooks recalled that he fell asleep after observing the victim leaning over the bowl, and the victim testified that she too fell asleep after vomiting in the bowl a couple of times.

Security camera footage showed the defendant arriving at Brooks' residence with a friend named Himanshu Sijapati and a bottle of Tito's vodka at 1:06 a.m. The defendant and Sijapati testified that Preston sent them text messages inviting them back to the residence for an after-party. According to the defendant and Sijapati, Preston was awake in the kitchen when they arrived and made them a couple of drinks before going to bed. At trial, the defendant testified that he then went to Brooks' bedroom to wake him up, where he found Brooks sleeping and the victim lying in bed watching the television.

The victim testified that she woke up when the bedroom door opened, saw the defendant enter the bedroom, and heard him say that he had nowhere else to sleep as he walked toward the victim's side of the bed. At the time, the

2

victim was lying on her side, face to face with Brooks. The victim then heard the defendant spit onto his hand and felt his wet hand touching her before she fell back asleep. At trial, the victim explained that she was "pretty . . . out of it from drinking, so [she] had fallen back asleep again." Later, the victim woke up again and felt the defendant, who was positioned behind her, having vaginal intercourse with her. The victim testified that she attempted to squeeze Brooks' wrist to wake him up, but she felt "[t]errified" and "stuck" and could not move. She also testified that she was "in and out of it the whole time" and fell back to sleep until she was awakened when the defendant pulled her underwear up and left the room.

At trial, the defendant painted a very different picture. Essentially, he claimed that the victim permitted him to share the bed and that they were watching a movie when the victim initiated sexual contact by grabbing his shorts. According to the defendant, he engaged in consensual digital penetration with the victim until he had an "epiphany" and started "thinking about [his] girlfriend and [his] one-year old at home. And I was like . . . I can't do this. Like, I can't be here." The defendant testified that he then helped the victim pull her underwear back up, apologized to her and left the room. After realizing that Sijapati had left without him, the defendant called an Uber for a ride home. Security camera footage showed the defendant leaving the residence at 1:39 a.m.

At approximately 6:30 a.m. on March 15, the victim woke up and texted a friend from Brooks' bedroom. In the text message, the victim informed her friend that one of Brooks' friends came into the bedroom and that when she woke up, Brooks' friend "was having sex with [her], and that [she] froze, and . . . couldn't do anything to stop it." She also told her friend that she tried to grab Brooks' wrist, but he did not wake up and that she was scared. When Brooks woke up, he noticed that the victim "was definitely [acting] very like weird" and she "wanted to leave like as soon as we both woke up." The victim did not initially inform Brooks about what happened earlier that morning, but ten minutes after her departure she called Brooks and told him that she had been sexually assaulted. The victim also texted Brooks with more details, informing him that one of his friends came into his bedroom and that she woke up to his friend having sex with her. In the text message, the victim also explained that she tried to squeeze Brooks' wrist to wake him up, but he did not wake up and she "couldn't do anything about it."

That same morning, Brooks texted the defendant: "why [did] you come into my room last night and f***k with that girl? Do you want to die?" In a responding text message, the defendant stated: "Yo, what? You was laughing earlier in the night when I was joking about a threesome . . . I was hammered. I don't even know what I was doing." During this text conversation, the defendant apologized to Brooks, but Brooks informed him that the victim "was scared for her life last night. She didn't know what was going on," to which the

defendant responded, "I was blacked out, too. I'm not saying what I did was right at all." In another text message to Brooks, the defendant stated: "I apologize to you, her, and my girlfriend. I am an a\*\*hole. I f\*\*\*ked up. . . . I'm sorry, bro. I don't know what I was doing. I would never do anything to try to hurt you." However, later that day, Brooks called the defendant's girlfriend and reported the victim's accusation. In response, the defendant texted Brooks: "Did you really run to my girl saying I raped her? That's funny because she was rubbing up on me last night, and I went with it."

The victim did not seek medical attention until after she reported the sexual assault to the police about a week later. Following an investigation, the defendant was indicted on two alternative AFSA charges and a burglary charge alleging, in part, that he knowingly entered Brooks' residence at night for the purpose of committing an AFSA. The defendant stood trial over four days in April 2023. During that proceeding, the State introduced multiple exhibits, including the security camera footage and text messages described above. The jury convicted the defendant on both AFSA charges and found him not guilty of the burglary charge. This appeal followed.

On appeal, the defendant posits that the trial court may have erred by failing to disclose information it reviewed in camera. With respect to this argument, we have reviewed the records withheld and those disclosed by the trial court and conclude that the court did not err by not disclosing the remaining records that it reviewed in camera.

The defendant next challenges two of the trial court's evidentiary rulings barring the introduction of text messages sent by Preston to Sijapati and sustaining the State's hearsay objection to the defendant's testimony that the victim invited him to subscribe to an "Only Fans" website account allegedly maintained by the victim. Generally, we review such challenges under our unsustainable exercise of discretion standard. See State v. Roy, 174 N.H. 622, 627 (2021). However, the State maintains that, to the extent the trial court erred, any error associated with its evidentiary rulings was harmless beyond a reasonable doubt. We agree.

To establish harmless error, the State must prove beyond a reasonable doubt that any purported error did not affect the jury's verdicts. State v. Boudreau, 176 N.H. 1, 11 (2023). This standard applies to both the erroneous admission and exclusion of evidence. Id. We consider the alternative evidence presented at trial, as well as the character of the erroneously admitted or excluded evidence itself. Id. To determine whether the State has proven beyond a reasonable doubt that an error did not affect the verdict, we must evaluate the totality of the circumstances at trial. Id. at 11-12. The factors we have considered when assessing a harmless error claim include, but are not limited to: (1) the strength of the State's case; (2) whether the admitted or excluded evidence is cumulative or inconsequential; (3) the presence or

absence of evidence corroborating or contradicting the erroneously admitted or excluded evidence; (4) whether the trial court took any curative measures; and (5) whether the other evidence of the defendant's guilt is of an overwhelming nature. Id. at 12. No one factor is dispositive. Id.

The defendant first argues that the trial court erred by prohibiting him from introducing text messages between Sijapati and Preston in which Preston invited Sijapati and the defendant first to the bar where Brooks, Preston and their friends were celebrating a birthday and next, to an after-party at Brooks' residence. After the first day of trial, the defense informed the State of its intention to introduce these text messages, which defense counsel had just obtained from Sijapati. The State objected to the evidence based upon its late disclosure, citing New Hampshire Rule of Criminal Procedure 12(b)(2). Ultimately, the trial court agreed with the State and barred the introduction of copies of the text messages, but permitted Sijapati to testify about receiving the messages and their content.

On appeal, the defendant maintains that these invitations to the bar and Brooks' residence were a "crucial dispute at trial," because both Brooks and Preston denied inviting the defendant or Sijapati to either the bar or an after-party. We disagree with the defendant's interpretation of the record.

First, neither Brooks nor Preston was questioned about inviting the defendant or Sijapati to the bar. Consequently, they did not deny extending any such invitation, and we fail to understand how an invitation to the birthday party at the bar was material to either the State's prosecution or the defendant's case. Rather, our review of the record indicates that the interaction between the defendant, the victim, and to some extent, Brooks, after the defendant arrived at the bar was significant to the defendant's case. Accordingly, we conclude that how or why the defendant and Sijapati appeared at the bar was immaterial, and the exclusion of text messages supporting the defendant's position was inconsequential.

Second, Sijapati and the defendant both testified that Brooks and Preston sent them text messages inviting them back to Brooks' residence for an after-party. Although both Brooks and Preston denied inviting anyone back to the residence for an after-party, the jury acquitted the defendant of committing a burglary by entering the residence without license or privilege with the criminal intent of committing an AFSA. Accordingly, the jury apparently determined that the defendant was invited back to Brooks' residence or that he entered the residence with the noncriminal intent of joining an after-party. Therefore, the text messages to Sijapati were cumulative of the testimony offered by Sijapati and corroborated by the defendant, and they were inconsequential. See State v. Edic, 169 N.H. 580, 590-91 (2017) (excluded evidence of a recorded telephone call for the purpose of attacking a prison witness' motives for testifying was cumulative of other admitted evidence that

the witness was motivated by a desire to get out of prison). For the foregoing reasons, we conclude that the exclusion of the copies of Preston's text messages, to which both the defendant and Sijapati testified, did not affect the jury's verdicts and that the State has established that any purported error was harmless beyond a reasonable doubt. See id. at 592 (concluding that the exclusion of testimony from prison officers was inconsequential in light of other evidence, including a cooperation agreement, bearing on a witness' motives to testify against the defendant).

We next address the defendant's claim that the trial court erred by sustaining the State's hearsay objection to the defendant's testimony that the victim invited him to join her "Only Fans" account during their interaction at the bar. The defendant argues that the proffered testimony was not hearsay because the victim's alleged question or invitation were not assertions of fact. He also maintains that the trial court erroneously found that the evidence violated the rape shield law set forth in RSA 632-A:6, II (Supp. 2024), because the alleged invitation or question did not constitute sexual activity or constitute an invitation to engage in sexual activity. The defendant further argues that the exclusion of this evidence prejudiced him because the trial "pitted the credibility of [the defendant] against the credibility of [the victim]" and evidence that the victim invited the defendant to "join her Only Fans site would tend to support [the defendant's] claim that she expressed interest" in him.

However, we conclude that any error by the trial court was harmless beyond a reasonable doubt. First, the evidence the defendant claims was erroneously excluded was cumulative of the other evidence presented at trial. After the trial court sustained the State's objection to the defendant's testimony that the victim invited him to join her "Only Fans" account, the court subsequently ruled that the State had opened the door to the same type of testimony during its cross-examination of the defendant. As a result of the court's curative step, on re-direct the defendant was permitted to testify that the victim, while at the bar, showed him nude and semi-nude photographs of her from her "Only Fans" site. He also explained that "Only Fans" is "a subscription service for people to put [or] elicit photos and videos on there, and people can subscribe for a monthly fee." Although the defendant did not explicitly testify that the victim invited him to subscribe to her "Only Fans" site, his testimony, if credited by the jury, would have created an inference that the victim wanted the defendant to see and review her account and, by implication, that she wanted him to subscribe to it. Accordingly, we conclude that the defendant's testimony on re-direct supported his claim that the victim "expressed interest" in him and, as such, the excluded evidence of the alleged invitation was cumulative of the evidence presented at trial and inconsequential. See State v. Lemieux, 136 N.H. 329, 331 (1992) (concluding that testimony was "merely cumulative" because "even if the testimony at issue had been excluded, the jury would nonetheless have had the witness's opinion before it").

6

Second, in contrast to the cumulative and relatively inconsequential nature of the excluded evidence, our review of the record indicates that the evidence of the defendant's guilt was powerful. The victim consistently testified that she did not consent to having sexual intercourse with the defendant. In particular, the most damaging evidence against the defendant was the victim's detailed description of the assault. Many of these specific details were corroborated by text messages she sent to her friend and Brooks shortly after waking up and leaving the residence on March 15. See id. at 331-32 (when viewed next to "the victim's description, in vivid detail, of the various sexual acts that the defendant forced her to perform" the improperly admitted evidence was inconsequential). The victim's testimony was also corroborated by the State's other witnesses. For example, Brooks' observation that the victim "was definitely [acting] very like weird" that morning and that she "wanted to leave like as soon as we both woke up" was consistent with the victim's account as to what had transpired.

Compared to the strength of the State's case, the defendant's case was hampered by the need to explain away and contradict numerous admissions of wrongdoing. The defendant was confronted with his own words in numerous text messages between himself and Brooks which established that the defendant had engaged in conduct that required apologies, explanations and excuses. Although the defendant denied raping the victim, he admitted to making a mistake, acknowledged that he "f**ked up" and was "an a***hole" and apologized to Brooks at least three times. Indeed, by his own account, the defendant admitted that he apologized to the victim before leaving the bedroom despite claiming that they had just engaged in consensual sexual activity.

The record also demonstrates that, when compared to the State's evidence, the defendant's case lacked credibility. The defendant contradicted himself by testifying inconsistently with his own text messages regarding his level of impairment that night. The defendant's credibility was also damaged by the testimony of multiple State witnesses who flatly contradicted his description of his interaction with the victim at the bar. We conclude that, under the totality of the circumstances at trial, the State has established that any purported error did not affect the jury's verdicts and was harmless beyond a reasonable doubt. Boudreau, 176 N.H. at 13-14.

For the foregoing reasons, we conclude that the trial court did not err in declining to disclose all of the records it reviewed in camera. We also conclude

that, to the extent the trial court's evidentiary rulings were erroneous, any such error was harmless beyond a reasonable doubt.  Accordingly, we affirm.

<u>Affirmed</u>.

MACDONALD, C.J., and DONOVAN and COUNTWAY, JJ., concurred.

**Timothy A. Gudas,**
**Clerk**

8